IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CYNTHIA F. WESLEY, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:05-CV-293-Y |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

### FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Cynthia Wesley brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act.  Wesley applied for disability insurance and SSI benefits on January 21, 1998, (Tr. 107, 858), alleging she has been disabled since June 13, 1997.[1] She maintained her insured status for disability insurance benefits through December

---

[1]  June 13, 1997 was selected because Wesley previously filed disability applications that were the subject of an unfavorable administrative decision on June 12, 1997.

31, 2002.  (Tr. 113).  The Social Security Administration denied Wesley's application for benefits both initially and on reconsideration.

Wesley requested a hearing before an administrative law judge (the "ALJ").  ALJ Kim Fields held a hearing in Lafayette, Louisiana on February 23, 2000, and issued an unfavorable decision on May 26, 2000.  (Tr. 866, 1134).  The Appeals Council granted Wesley's request for review, reversed the ALJ's decision, and remanded the case to the ALJ for further development.  (Tr.891).

The case was reassigned to ALJ Dennis L. Pickett, who held a second administrative hearing on December 11, 2003 in Lafayette, Louisiana.  (Tr. 1158).  Wesley was represented by counsel. On July 27, 2004, ALJ Pickett issued a decision that Wesley was not disabled and was not entitled to disability or SSI benefits because she was capable of performing a modified range of light work activity.  (Tr. 24-46).   The Appeals Council denied Wesley's request for review of ALJ Pickett's decision, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 9).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972.   Second, the claimant must have an impairment or combination of impairments that is

2

severe. An impairment or combination of impairments is severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in

the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995);  *Hollis v. Bowen*, 837

F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is such relevant evidence as a responsible

mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is

more than a mere scintilla, but less than a preponderance. *Id*.  A finding of no substantial evidence

is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.*

This Court may neither reweigh the evidence in the record nor substitute its judgment for the

Commissioner's, but will carefully scrutinize the record to determine if the evidence is present.

*Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383.

C.      ISSUES

    1.      Whether the assessment of Wesley's residual functional capacity complies with
        relevant legal standards and has the support of substantial evidence;

    2.      Whether the ALJ erred in considering Wesley's non-compliance with prescribed
        treatment as a factor in his decision;

    3.      Whether the ALJ adequately weighed the disability ratings imposed by another
        government agency;

    4.      Whether there is substantial evidence to support a finding that Wesley is capable of
        performing other work existing in significant numbers in the national economy.

D.      ADMINISTRATIVE RECORD

    1.      Medical History

        a.      Physical Impairments

Wesley is obese and asthmatic, and she wears bilateral knee braces because of arthritis.  (Tr.

464, 507, 694, 700). Wesley injured her knees while in the military.  (Tr. 527).

Wesley underwent a disability evaluation with physician Brian Heinen, M.D., on March 31,

1998.  (Tr. 628).  Wesley complained of intermittent low back pain and knee pain.  She exhibited a normal gait, although she occasionally favored her right knee.  She reported that she had visited the emergency room on four occasions within the past year because of asthma attacks.  (Tr. 628).  She also stated that she attended follow-up visits at a mental health clinic every three months for nerves and anxiety.  A physical examination was unremarkable, with no muscle atrophy and no arthritic changes noted in her extremities.  Wesley exhibited full range of motion in all extremities.  (Tr. 629).  Heinen observed no crepitance or instability in Wesley's right knee.  Wesley declined to perform knee bends because she stated that  her knee was too painful.  No neurological deficits were noted.  A mental status examination was also unremarkable.  (Tr. 630).

Heinen diagnosed chronic asthma, chronic mild lumbar sacral pain; chronic mild knee pain that was probably osteoarthritis related to Wesley's weight; and chronic anxiety that was controlled with medication.  Heinen found some inconsistencies in Wesley's movements as compared to her complaints of back pain and knee pain.  Although Wesley might have mild discomfort at times, Heinen found her capable of performing most manual labor and completing an eight-hour shift.  He further opined that her anxiety should not prevent her from working.  (Tr. 630).

X-rays of Wesley's lumbosacral spine taken September 24, 1998 were interpreted as normal.  (Tr. 718).  Magnetic resonance imaging (an MRI) of Wesley's lumbar spine was performed May 11, 1999 and also yielded normal results.  (Tr. 696).

Consulting examiner Harold A. Heitkamp examined Wesley in December 1999 to assess her complaints of knee pain and low back pain.  (Tr. 744).  On examination, Wesley exhibited full range of motion in her lumbosacral spine with no muscle spasms, but some tenderness over the sacroiliac

joint without radiation.  (Tr. 745).  She had diminished and absent reflexes across her body, and was very tense during the evaluation.  A popping sound was heard with flexion of her right knee, but Wesley demonstrated full range of motion in both knees.  Wesley walked without a limp and was able to squat forty-five degrees before knee pain prevented her from bending any further.  Straight leg raising tests were negative bilaterally.  X-rays showed slight narrowing of the right knee joint, which Heitkamp assessed as an essentially negative x-ray.

Heitkamp diagnosed sacroilitis and early degenerative changes of the knee.  He opined that Wesley was limited to lifting no more than thirty pounds and lifting no more than fifteen pounds repetitively, and she needed to avoid prolonged walking or running.  (Tr. 746).

Wesley underwent another consultative evaluation in February 2004 with orthopedic surgeon Robert Holladay.  (Tr. 1126).  Wesley demonstrated a restricted range of motion and generalized tenderness in her lumbar spine.  Straight leg raising test was negative bilaterally.  Wesley's knees were also tender on examination, with mild crepitation noted bilaterally.  (Tr. 1127).  Wesley exhibited a normal gait, and x-rays of her right knee showed no evidence of arthritic changes.  (Tr. 1128).  Holladay assessed depression, obesity, mild chondromalacia bilaterally, and chronic low back pain.  Holladay opined that Wesley could sit, stand or walk for six hours out of a standard eight-hour workday; occasionally lift and carry weights of twenty or twenty-five pounds; frequently lift and carry weights up to ten pounds; and use her upper extremities for grasping, fine manipulation, pushing, pulling, and reaching overhead.  Holladay also opined that Wesley would benefit from frequent position changes for prolonged standing.  (Tr. 1128).

6

b.      Mental Impairments

Wesley has a lengthy treatment history for dysthmia, symptoms of depression, and poor anger management.  (Tr. 494-504, 552-54).   On September 17, 1997, Wesley asked to be hospitalized at  the Veterans Administration Medical Center (VAMC) for depression.  She was advised to get out of her house more often and be more active.  (Tr. 614-15).  In December, she complained of feeling jittery, nervous and not sleeping well.  She had been out of her anti-anxiety medication for two months.  (Tr. 620).  In March 1998, Wesley reported that she was attending classes three days a week and participating in clinicals two days a week to obtain her certification as a nurse's aide.  She  complained of having an unstable sleep pattern.  (Tr. 624).  Her therapist recommended that she increase her activities and level of exercise.

Wesley's mental status examination in May 1998 was assessed as stable.  (Tr. 633).  She reported doing well on  recent tests to obtain her nurse's aide certification, but complained of more suicidal thoughts and financial troubles because of an increase in her rent.  (Tr. 634).   In June, Wesley reported finding a new and better apartment.  She had obtained part of her nurse's aide license, and was happy because she was going on vacation to visit her brother.  (Tr. 661).

On September 14, 1998, Wesley was admitted to the Veterans Administration Medical Center (VAMC) with complaints of depression and suicidal ideation. (Tr. 727).   She admitted decreasing or discontinuing her medications two or three weeks earlier because of nightmares.  (Tr. 656).  Wesley complained of difficulty concentrating, paranoia, early awakenings, low energy, and poor self-esteem.  During her stay, Wesley was treated with medication, counseling, classes and activities.  She reported a decrease in her symptoms and was discharged on December 9, 1998.  Her

Global Assessment of Functioning (GAF) score was listed as 40 at the time of admission and 78 when she was discharged.[2]  (Tr. 727).  Her discharging physician classified her as unemployable, but also approved her return to college the following month if she continued to exhibit mental stability.  (Tr. 730).

During follow-up treatments with the VA, Wesley indicated that she felt much better, although she continued to have some depression and mood swings.  (Tr. 708).  She was attending college courses on a part-time basis. (Tr. 708).  She reported some drowsiness from her medications in February 1999, (Tr. 699), but in May, she had no complaints of medication side-effects.  (Tr. 695).  In August 1999, Wesley reported that she had tapered off her medications because she was enrolled in twelve credit hours of classes at the community college and also wanted to start a family. She described mild symptoms of depression, but felt she was coping adequately.  (Tr. 689).

On December 16, 1999, psychologist Larry J. Benoit performed a consultative mental status evaluation.  (Tr. 731).  Wesley was cooperative if somewhat withdrawn during the interview, but her speech was coherent, logical and relevant.  (Tr. 734).  Her mood was somewhat sad with a slightly restricted affect.  When questioned, Wesley admitted being easily angered and lashing out. She had a history of suicidal ideations, and she had been hospitalized on two occasions because she was concerned about acting on her impulses.  (Tr. 735).  Although she had experienced auditory and visual hallucinations at or near the time of her hospitalization, she had not experienced

---

[2] A GAF score is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.* at 34.  A GAF score of 78 reflects transient or slight impairment in functioning. *Id.*

hallucinations at other times before or since her hospitalizations.  She also complained of anxiety attacks that were more consistent with stress than genuine panic attacks.  (Tr. 736).

Wesley said her depressive episodes generally persisted for about six months and were marked by depressed mood, hypersomnia, increased appetite, psychomotor retardation, fatigue, loss of energy, difficulty with concentration and decision-making, withdrawal and isolation, and recurrent thoughts of dying.  She attributed her depression to her medical problems, and also thought that she succumbed to stress too easily.   (Tr. 735-36). She complained that the medications prescribed for depression had made her feel like a zombie, and told Benoit that she was no longer taking any medications.   (Tr. 736).

Benoit observed that Wesley did surprisingly well on formal testing.  Her neurological and cognitive functioning was within broadly normal limits, and she performed in the average to high-average range of intellectual functioning.   (Tr. 736-37). Wesley demonstrated intact general orientation, attention, concentration, spatial reasoning, long-term memory retrieval, mathematical processing ,and basic judgment.  (Tr. 735).   She had mild difficulty with short-term memory retrieval and abstract verbal reasoning. (Tr. 735).

Benoit found Wesley's history and presentation to be consistent with recurrent major depressive episodes.  He assessed a guarded prognosis due to the long-standing nature of her problems, and noted that her multiple physical complaints demonstrated a tendency towards somatization. (Tr. 737). He opined that Wesley would likely function normally for extended periods of time until depression caused her to withdraw from social contact.  (Tr. 738).

Benoit also completed an assessment of Wesley's ability to perform work-related mental

tasks.  Wesley's ability to follow work rules, function independently, maintain attention and concentration, perform complex job instructions, and maintain her personal appearance was assessed as good.  (Tr. 740-41).  Benoit found Wesley had a fair ability to relate to co-workers, deal with the public, use judgment in dealing with the public, interact with supervisors, deal with work stress; relate predictably in social situations, and demonstrate reliability.  (Tr. 740-41).  He found Wesley had poor or no useful ability for behaving in an emotionally stable manner.  (Tr. 741).

In March 2000, Wesley told her therapist that she was attending school and following a general business curriculum.  (Tr. 985).  She had stopped taking her medication for a while because she wanted to start a family, but realized she needed her medications after her anxiety level increased.  (Tr. 985).  She was given a prescription for the antidepressant Zoloft.

Upon returning to the VA mental health clinic in July 2000, Wesley complained of agitation, lashing out, nervousness, sleep disturbances, but denied hearing voices or having suicidal thoughts.  (Tr. 987).  She had difficulty concentrating at school, and admitted physically assaulting a male friend just days earlier.  Wesley appeared anxious and stood by her chair during the interview, explaining that she could not sit still.  Her mood was depressed and anxious, and she was restless and constantly moving about during the interview.  The clinician diagnosed depression with a notation to rule out bipolar disorder.  Wesley's current GAF score was assessed as 60.[3] Wesley's medications were adjusted.  (Tr. 988).

Wesley was hospitalized at the VAMC on April 19, 2001 for complaints of depression, thoughts of suicide, and bad dreams.  She was considered noncompliant for failing to take

---

[3]A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning, DSM-IV at 34.

medications for two months, but stated that she quit because the medications affected her sleep and were not helpful. (Tr. 989-96). She was discharged on July 2, 2001 with a diagnosis of bipolar disorder. Her prognosis was assessed as guarded given the chronic nature of her mental illness, poor coping skills, and poor anger management. She was classified as unemployable at the time of discharge, but planned to attend school. (Tr. 1037).

On March 18, 2002, Wesley reported doing well on her current medications. (Tr. 942). But during a check-up on May 22, 2002, Wesley complained of fatigue, weight gain, anhedonia, agitation, irritability, and spending money she did not have to make herself feel better. (Tr. 943). On examination, Wesley was sullen, tired and sluggish. Her diagnosis was mood disorder, with a current GAF score of 60. (Tr. 946). She was instructed to continue with her current medications.

Wesley called the VA mental health clinic in June with complaints of feeling edgy and irritable. (Tr. 954). In July, Wesley reported that medication changes had improved her sleep and alleviated her mood swings. (Tr. 954). She planned on attending school full-time to study computer programming. (Tr. 956). In September, she reported discontinuing the mood stabilizer Depakote due to its sedative effect and experiencing an increase in hypomanic symptoms thereafter. She denied any depression or sadness, and wanted to continue her use of Zoloft. (Tr. 1068). She was anxious and slightly distressed during the interview, and exhibited mild psychomotor agitation. A new mood stabilizer, Risperdal, was prescribed.

During a check-up in January 2003, Wesley reported that her antidepressant was helpful, but she had stopped using the Risperdal because she found it too sedating. (Tr. 1080). She complained of angry outbursts, irritability, insomnia, and several hypomanic episodes that lasted one to two

days. (Tr. 1081). She was pleasant and made good eye contact during the interview, with no signs of psychomotor agitation. Her dosage of Risperdal was decreased. (Tr. 1081). In April 2003, Wesley stated that she was stable and had enjoyed a good response to her current medications. (Tr. 1084).

Clinical psychologist Alfred Buxton, Ph.D., evaluated Wesley on August 11, 2003. (Tr. 1088). She described her energy level as poor and stated that she generally kept to herself. Reading was her primary hobby. She was dressed and groomed, and exhibited good social skills. On examination, both recent and remote memory was intact. Her pace with in line with a regular rate of performance. Her judgment was good, and her insight was assessed as fair. (Tr. 1089).

Buxton noted that Wesley carried a current diagnosis of bipolar disorder, with a moderate degree of impairment, chronic pain, and personality disorder. He assessed a GAF score of 65, assigned Wesley a fair prognosis, and opined that she was capable of securing and maintaining gainful competitive employment in the general community. He also opined that Wesley should be able to perform in a reliable and dependable fashion over a protracted period of time as long as the job setting did not aggravate her allergies, pain complaints, and the like. (Tr. 1090).

Buxton completed a medical source statement addressing Wesley's ability to perform work-related mental activities. He found no impairment in Wesley's ability to understand, remember, or carry out short, simple instructions, and only slight impairment in her ability to understand, remember or carry out detailed instructions. She had slight impairment in her ability to make work-related decisions and interact appropriately with the public, supervisors or coworkers, and moderate impairment in her ability to respond appropriately to work pressures and changes in a routine work

setting.  (Tr. 1091-92).  He opined that Wesley had the minimally adequate ability to tolerate frustration and stress encountered in a job setting, and she should be able to establish and maintain mutually rewarding relationships with co-workers and supervisors.  (Tr. 1090).

On September 27, 2003, the VA issued a determination that Wesley's depressive disorder or dysthmia constituted a fifty percent service-connected disability, effective August 26, 2002.  (Tr. 926).  Wesley was already receiving VA benefits for a combined forty-percent service-connected disability rating based on her depression, asthma, and knee problems.  (Tr. 936).

In November 2003, Wesley complained of mood fluctuations and periods of depression with impaired concentration, a lack of motivation, social isolation, and racing thoughts.  She complained that Risperdone was sedating, and consequently, she did not always take her medication.  (Tr. 1111).  Her mood was moderately depressed.  (Tr. 1112).  During a follow-up visit in January 2004, Wesley reported a significant increase in her energy, mood and alertness.  (Tr. 1105).  Her mood was mildly depressed, although she was cooperative throughout the interview.  She was advised to exercise, visit with family, and improve her sleep habits.  (Tr. 1105).

2.    Administrative Hearing

Wesley was born August 10, 1969 and completed high school.  (Tr. 1167-68).  She testified that she had recently moved into an apartment in Haltom City, Texas.  She lived alone, using veterans' benefits to pay her bills.  (Tr. 1168).  She testified that she had enrolled in several vocational rehabilitation programs over the years, including training as a certified nursing assistant and business courses, but had been unable to complete most of these programs because of her physical and mental impairments; however, she had recently completed vocational computer skills

13

training program.  (Tr. 1168-69).  During the hearing, Wesley's attorney conceded that his client's condition had improved as reflected in her successful completion of the rehabilitation program in November 2003.  (Tr. 1163-66).

Wesley testified that she served in the military from 1993 to 1995 and received a general discharge with honorable conditions.  She trained as a diesel mechanic while in the military, but did not pursue that occupation after she left the military.  (Tr. 1170).  She had attempted to work at a warehouse in 2002, but quit after three months because of depression, allergies, and asthma attacks that she attributed to the work environment.  (Tr. 1170). Her most recent lengthy employment was a job as a short-order cook, but she lost that job in 1997 when she was hospitalized for depression.  (Tr. 1171-72).  Wesley had also worked as a newspaper delivery person, custodian, and a sleeve machine operator for a clothing manufacturer.  (Tr. 1173).

Wesley testified that she would lock herself in her room during her depressive episodes, emerging only to use the restroom.  (Tr. 1174).  She described crying spells and isolation that would last days or even months, and testified that she had been hospitalized on three occasions for approximately three months each time.  (Tr. 1175).  Wesley testified that she had suicidal thoughts intermittently over the past several years, and she had problems with anger management. She had episodes of sleeping excessively, and testified that her medications made her more sleepy.  Wesley also testified that she had difficulty with her concentration, and she had to be in a controlled environment if she wanted to focus or read.  (Tr. 1176-77).

In addition to depression, Wesley testified that she had menstrual problems that caused severe back pain, headaches, vomiting, cramps, and nausea, and rendered her bedridden for days.

14

(Tr. 1177).  She used inhalers and allergy medications for acute asthma, and complained of low back

pain and arthritis that affected her knees.  Wesley estimated that she could stand in a stationary

position for fifteen to twenty minutes before needing to move around, she could walk one block

without needing to rest, and she could lift twenty or twenty-five pounds.  (Tr. 1177-78).  She had

no difficulty sitting or using her arms and hands.  (Tr. 1178).  She testified that she was unable to

bend or squat because she could not return to a standing position without assistance.  Wesley

testified that she did her own housework.  (Tr. 1179).  She attended her doctors' appointments and

visited the library, but generally avoided crowded situations.  (Tr. 1179-80).  Her driver's license

had been revoked, and she had not applied for reinstatement.  (Tr. 1179).

Wesley testified that working tended to aggravate her depression, causing mood swings and

stress from the pressure to be on time.  (Tr. 1181).  Wesley attended weekly counseling sessions at

the VA.  She testified that she had discontinued her medications on occasion because they made her

too sleepy.  (Tr. 1183).

Vocational expert Lester Soileau testified during the hearing.  (Tr. 920).  He reviewed

Wesley's employment history and  testified that the job of diesel mechanic is skilled, heavy work;

the jobs of short-order cook and nurse's aide are semi-skilled, medium work; newspaper delivery

is unskilled work requiring light exertion; a stock clerk position is semi-skilled, heavy work; and

work as a machine operator is skilled, light work.  The ALJ asked Soileau to consider an individual

of Wesley's age, education and work history with the following functional limitations:

> [R]esidual functional capacity to perform light work that does not require climbing
> of ladders, ropes or scaffolds.  Requires only occasional climbing of ramps and stairs
> and only occasional balancing, stooping, kneeling, crouching and crawling.  And
> does not have moderate exposure–in other words, mild exposure would be okay but

not have moderate exposure to fumes, odors, dusts, gases, poor ventilation. . . .But a slight limitation in the ability to understand, remember, carry out detailed instructions, slight in ability to make judgments on simple, work-related decisions, slight limitation in the ability to interact appropriately with the public, supervisors and coworkers, moderate limitation in the ability to respond appropriately to work pressures in a usual work setting.

. . . .

And moderate limitation in ability to respond appropriately to changes in a routine work setting.

(Tr. 1187-88).

Soileau initially testified that Wesley possessed data entry skills based on her recent completion of a vocational rehabilitation program, but the ALJ instructed Soileau to disregard work skills Wesley had acquired so recently.  (Tr. 1190).   Soileau then testified that Wesley could work as a general office clerk; a food assembler, price marker, or order filler.  (Tr. 1190-91).  If Wesley was further limited to relatively low stress work and only occasional public contact, the same jobs would still be suitable.  (Tr. 1192).  Adding the restriction of simple, repetitive tasks would eliminate the jobs of general office clerk or order filler, but work as a food assembler or price marker was still suitable.  (Tr. 1193).   Soileau noted that an inability to behave in an emotionally stable manner would preclude employment.  (Tr. 1197).

        3.      ALJ Decision

        The ALJ found that Wesley had not engaged in substantial gainful activity since her alleged onset date.  He also found that Wesley's depression, obesity, chondromalacia, and chronic low back pain were severe impairments, but her impairments failed to meet or medically equal the criteria of any listed impairment.  (Tr. 45).  The ALJ also found that Wesley's allegations about her limitations were not credible to the disabling degree alleged because she retained the residual functional

16

capacity for light work with no exposure to airway irritants and only low-stress, simple, routine repetitive work limited to occasional interaction with the public. (Tr. 45). Wesley was unable to perform her past relevant work with the foregoing limitations, but based on the vocational expert evidence, the ALJ found Wesley was capable of making a successful adjustment to other work existing in significant numbers in the national economy. (Tr. 44). Accordingly, Wesley was not considered disabled or entitled to an award of disability insurance or SSI benefits. (Tr. 46).

D.     DISCUSSION

1.     Treating and Examining Source Opinions

Wesley asserts that the ALJ's assessment of her residual functional capacity (RFC) is unsupported by substantial evidence and does not adequately reflect all of her nonexertional impairments as found by treating and examining medical sources. The ALJ based his RFC assessment on the consultative evaluation reports from Heitkamp, Holladay, and Buxton, as well as Wesley's treatment records with the VA. (Tr. 42-43).

Wesley complains that the ALJ erred in relying on Buxton's findings as evidence of her mental functioning because Buxton did not evaluate her until 2003, during a period in which she concedes she experienced improvement, and his report does not provide a longitudinal picture of her functional abilities throughout the relevant time period. Instead, she contends that Benoit's consultative evaluation in 1999 is a better reflection of her functioning.

In evaluating medical source opinion, the regulations require that the ALJ consider the following factors: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). *See also* SOCIAL

17

Case 4:05-cv-00293-Y   Document 18   Filed 02/07/06   Page 18 of 24   PageID 104

SECURITY RULING 96-2p, 96-5p.  The ALJ considered Benoit's assessment, but found it internally inconsistent given that objective testing showed Wesley was functioning within broadly normal limits.  (Tr. 35-36).  The ALJ also noted that Benoit failed to mention Wesley's non-compliance with her medications, which the ALJ considered a precipitating factor for Wesley's episodes of exacerbation of her depression.  The ALJ also discounted Benoit's opinions because Wesley had been taking no medications at the time of the assessment.  (Tr. 36).

Wesley contends that Benoit's opinion was deserving of more weight because it is consistent with treating source determinations that she is unemployable.  The ALJ acknowledged that Wesley was generally listed as unemployable when she was discharged after each hospitalization, but found it unclear why she was so restricted when her hospital records showed her to be stable and responsive and her treating psychiatrists approved her return to school. Opinions, diagnoses, and medical evidence from a treating physician who is familiar with the claimant's impairments, treatment, and response should be given great weight in determining disability.  *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995);  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). However, medical opinions are statements that reflect judgments about the nature and severity of a claimant's impairments, diagnosis and prognosis, and what a claimant can still do despite their impairments and physical and mental restrictions.   20 C.F.R. §§ 404.1527(a), 416.927(a). Determinations that a patient is unemployable or disabled are opinions on issues reserved to the Commissioner and are not entitled to special significance.  20 C.F.R. §§ 404.1527(e), 416.927(e). The ALJ's decision to assign more weight to Buxton's report than Benoit's opinions is supported by substantial evidence.

Wesley also asserts that the ALJ erred in failing to incorporate all of the physical limitations identified in Holladay's consultative evaluation, particularly Holladay's opinion that Wesley would benefit from alternating positions during the workday.  The ALJ did not ignore this suggested work-related restriction, but instead found that Holladay's objective findings failed to support the need for such a limitation.  (Tr. 40, 42).  The ALJ provided an adequate explanation for not restricting Wesley to work allowing her to alternate positions.

Wesley fails to demonstrate error or a lack of substantial evidence to support the weight and consideration the ALJ gave to the opinions of treating and examining medical sources.

2.      Credibility and Non-compliance with Treatment

Wesley contends that the ALJ erred in deciding that her noncompliance with her medication regimen contributed to exacerbations in her depression.  She contends that the ALJ violated Social Security Ruling 82-59 and ignored medication side-effects that justify her decision to discontinue her medications.   Ruling 82-59 sets forth the Commissioner's policy about claimants who are disabled, but without justifiable cause refuse to follow treatment that can reasonably expected to restore the person's ability to work.  SOCIAL SECURITY RULING 82-59.  An individual may be found to have failed to follow prescribed treatment when the following four conditions exist:

> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA); and
> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
> 3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
> 4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

SOCIAL SECURITY RULING 82-59.

19

But Social Security Ruling 82-59 only applies to claimants who would otherwise be disabled within the meaning of the Act.  It does not restrict the use of evidence of noncompliance for other purposes during the disability hearing, i.e., to assess credibility.  *See, e.g., Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001); *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.  2000). The ALJ did not find Wesley's impairments to be so severe as to be disabling in the first place, nor did he deny benefits because of her failure to follow prescribed treatment to remedy a disabling condition.  Here, the ALJ did not rely on Wesley's non-compliance to disqualify her from receiving disability benefits. Instead, her non-compliance in unilaterally discontinuing her medication was just one of several factors the ALJ considered in his assessment of her residual functional capacity to perform sedentary work.  Ruling 82-59 is not applicable, and the ALJ's failure to adhere to its procedural requirements is not a basis for disturbing the Commissioner's decision.

3.      VA Disability Ratings

Wesley also contends that the ALJ should have given great weight to the disability ratings assigned by the VA.  A determination of disability by the VA must be considered and is usually entitled to great weight, but it is not binding on the ALJ because the criteria applied by the two agencies is different.  20 C.F.R. §404.1504; *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990); *Underwood v. Bowen*, 828 F.2d 1081, 1083 (5th Cir. 1987).  The ALJ may decline to give great weight to a VA disability determination so long as he adequately explains the valid reasons that support his decision.  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

The ALJ noted that Wesley had received a 30% service-connected disability rating for depression, (Tr. 34),  but did not mention the VA decision increasing that rating to 50% effective

20

August 2002 or address the weight given to the VA ratings. The ALJ's failure to provide an explicit discussion of the VA disability rating hinders judicial review and requires remand to cure this omission. Although Wesley has not demonstrated that either a 30% or a 50% service-connected disability rating is the equivalent of an inability to engage in any substantial gainful work activity,[4] the weight and effect of these ratings is a matter for the Commissioner to assess in the first instance. On remand, the ALJ should specifically address the VA determinations and explain the weight, if any, afforded to the VA decisions.

4.    Availability of Other Work[5]

Wesley contends that the Commissioner failed to meet her burden at Step Five of the sequential evaluation process to establish the existence of other work available in significant numbers that Wesley could perform. Wesley points out a patent error in the ALJ's decision: the ALJ found Wesley capable of performing work as a data entry clerk, general office worker, food preparer, price marker, and order filler when that finding is contrary to the vocational expert testimony. (Tr. 44). The vocational expert testified that a person limited to low stress, routine, repetitive work would be capable only of the food assembly and price marking jobs. Regardless of the ALJ's error, Wesley cannot demonstrate harm as there are at least two suitable jobs identified within her RFC.

Wesley asserts that there is no evidence that the work identified exists in significant numbers in the national economy. She premises her argument on the fact that the vocational expert listed the

---

[4] The VA specifically declined to give Wesley a higher disability rating. (Tr. 927).

[5] Wesley's complaint with respect to the existence of other work within her given RFC is addressed for the sake of completeness, but on remand, the Commissioner may deem it necessary to reconsider or revise the RFC determination and obtain additional vocational evidence as appropriate.

number of jobs available nationally and regionally by census code instead of a specific occupation listed in the <u>Dictionary of Occupational Titles</u>. Wesley fails to demonstrate error or harm.

The vocational expert, when presented with a hypothetical worker of Wesley's age, education and RFC, testified that there was work available for a person with the described limitations and identified specific occupations by their respective DOT classification numbers. (Tr. 1190-91). Additionally, the regulations provide that the Commissioner may take administrative notice of job data in government publications, including census reports. 20 C.F.R. § 404.1566(d)(3), 416.966(d)(3).

The Commissioner's determination that Wesley is capable of performing other work available in significant numbers in the national economy is supported by substantial evidence and has not been shown to be a product of legal error.[6]

RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with the foregoing proposed findings of fact and conclusions of law.

---

[6] Wesley also argues that the ALJ presented the vocational expert with a defective hypothetical that failed to reflect all impairments reflected in Benoit's consultative evaluation report. As already addressed, the ALJ did not adopt Benoit's findings and provide adequate reasons for that decision. Wesley does not assert that the hypothetical presented to the vocational expert is not an accurate reflection of her RFC as found by the ALJ.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED
## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until March 1, 2006.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until March 1, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

23

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED FEBRUARY 7, 2006.


_____/s/   Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE